IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| **HENRY JAMES CLARKS**<br>*Plaintiff*<br><br>v.<br><br>**PRIVATE MONEY GOLDMINE**, *et al.*<br>*Defendants* | Case No.:  8:19-1014-GJH |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants, by their undersigned counsel, pursuant to Fed. R. Civ. P. 12(b)(6) and 56, submit this Memorandum in Support of its Motion to Dismiss Complaint, or in the Alternative, for Summary Judgment.

### I.      Background of the Case

Plaintiff brought a five-count Complaint in the Circuit Court for Prince George's County against Defendants, seeking compensatory and punitive damages.  The case was removed to this Court.  The five counts of the Complaint, in order, allege state law causes of action for breach of contract (Count 1), money had and received (Count 2), breach of fiduciary duty (Count 3), misappropriation of funds (Count 4), and fraud (Count 5).

### II.      Summary of the Argument

Defendants operate a website that connects prospective borrowers seeking private money to fund real estate deals with prospective lenders.  Plaintiff was a user of the website.  Although the Complaint is hardly a model of clarity, Plaintiff appears to be attempting to hold Defendants liable for $900,000 that he alleges he lost in business deals that he transacted with other users of Defendants' website.  Complaint, attached hereto as Exhibit 1, at ¶¶ 8, 11.  However, the

Complaint must be dismissed because Defendants, as providers of interactive computer services, are immune under federal law against all of Plaintiff's claims for liability. Even if no such federal statutory immunity applied, the Complaint in each count fails to state a claim upon which relief can be granted under state law for breach of any contractual obligation owed by Defendants to Plaintiff, or for any alleged tortious acts by Defendants directed toward Plaintiff. In addition, Plaintiff has not alleged, and cannot establish, any facts sufficient to pierce the corporate veil so as to impose liability on the one individual Defendant.

**III.     Statement of Undisputed Facts**

Defendant FM 41, Inc. (incorrectly sued as FM41, Inc.) is the general partner of Defendant REI Network, L.P. Affidavit of Alex F. Soares, attached hereto as Exhibit 2, at ¶ 1. Defendant John Douglas Smith is President of FM 41, Inc. *Id.* REI Network, L.P. ("REI") is an interactive computer service provider that operates a website known as Private Money Goldmine (privatemoneygoldmine.com). Exhibit 2 at ¶ 2. The website serves as an online platform to connect private lenders and borrowers who seek to lend or borrow money to finance real estate transactions. *Id.*

For each prospective lender, the website posts the prospective lender's name, contact information, lending locale, amount of funds available to lend, and interest rate offered. Exhibit 2 at ¶ 2; Exhibit 3. The information is posted in list form, and is updated as new lender information is obtained. *Id.* Defendants do not create or develop the information provided on the website by the prospective lenders. Exhibit 2 at ¶ 3. All such lender information that is posted on the website is provided by the prospective lenders themselves, who pay no fee to list their information on the website. *Id.*

To access the website's services, prospective borrowers must first subscribe to the website by agreeing to pay an initial fee of $97 and a monthly subscription fee of $29, by credit card. Exhibit 2 at ¶ 4. The website then provides the subscribers with access to the list of lenders and other tools. *Id.* Prospective borrowers who subscribe to the website may sort the lender list by locale, the amount available to lend and the interest rate offered. *Id.* Prospective borrowers who subscribe must initiate contact on their own directly with any potential lenders that they select from the website's list. *Id.* The subscribers also have access to tools on the website to help them keep track of which potential lenders they contact, and their notes of each such contact, if they so desire. *Id.*

Plaintiff Henry James Clarks was a subscriber to the website. Exhibit 2 at ¶ 5. According to Plaintiff, he used the services provided by the website to connect with other users, with whom he transacted business. Exhibit 1 at ¶¶ 8, 11, 15, 18, 19, 21, 35. An example of a screenshot of a list of lenders that a subscriber such as Plaintiff would have seen is attached as Exhibit 3. The list of lenders on the website has the following disclaimer, highlighted at the top of the screen:

> Disclaimer and Warning
>
> We are not acting as a broker for any funds that you borrow from the private lenders in this list. We are simply providing their information. Any dealings that you may have with these lenders are strictly between you and them. We have done no independent investigation with respect to, and we make no representation or warranty that, these lenders are honest, trustworthy, or fair. When they indicate an interest in lending, we simply collect their information and add it to the list. We cannot be held responsible for deals that go sour. We recommend that you do your own due diligence on these lenders and seek the advice of qualified legal counsel before borrowing from any of these lender[s]. Borrow at your own risk!

Exhibit 3; Exhibit 2 at ¶ 6. In addition, all subscribers are directed to read a disclaimer virtually identical to the one quoted in the paragraph immediately above, and to click a check box

signifying their agreement to be bound by it, before they are permitted to pay for their subscription and access the website's services.  Exhibit 2 at ¶ 7; Exhibit 4.  Potential subscribers such as Plaintiff cannot complete the subscription process by inputting their credit card payment information, without first clicking a checkbox to signify that they agree to the above disclaimer. *Id.*

Subscribers such as Plaintiff are also given a receipt upon payment, which contains yet another copy of the same disclaimer language referenced above.  Exhibit 2 at ¶ 8.  Such a receipt and disclaimer that was given to Plaintiff is attached as Exhibit 5.  In addition to all of these copies of REI's disclaimer given to Plaintiff, all potential subscribers to the website may access the website's Terms of Service page without actually subscribing to the service.  Exhibit 2 at ¶ 9.  The Terms of Service page, attached as Exhibit 6, clearly says, in bold text at the top:

> IF SUBSCRIBER IS NOT WILLING TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT, SUBSCRIBER SHOULD PROMPTLY EXIT FROM THIS WEBSITE AND REFRAIN FROM USING ITS SERVICES.  BY USING OR ACCESSING THE SERVICES, SUBSCRIBER AGREES TO BE BOUND BY THE FOLLOWING TERMS AND CONDITIONS.

Among other things, the Terms of Service page informed the website users, including Plaintiff, of the following, in relevant part:

> 5. WARRANTY DISCLAIMER
>
> * * *
>
> PrivateMoneyGoldmine.com DOES NOT MAKE ANY WARRANTY PERTAINING TO ANY GOODS OR SERVICES PURCHASED, OBTAINED, SECURED OR ACQUIRED THROUGH THE SERVICES OR ANY TRANSACTION ENTERED INTO THROUGH THE SERVICES.
>
> PrivateMoneyGoldmine.com DOES NOT WARRANT THE ACCURACY OR RELIABILITY OF THE RESULTS OBTAINED THROUGH USE OF THE SERVICES OR ANY DATA OR INFORMATION DOWNLOADED

OR OTHERWISE OBTAINED OR ACQUIRED THROUGH THE USE
OF THE SERVICES.  SUBSCRIBER ACKNOWLEDGES THAT ANY
DATA OR INFORMATION DOWNLOADED OR OTHERWISE
OBTAINED OR ACQUIRED THROUGH THE USE OF THE SERVICES
ARE AT SUBSCRIBER'S SOLE RISK AND DISCRETION AND
PrivateMoneyGoldmine.com   WILL   NOT   BE   LIABLE   OR
RESPONSIBLE FOR ANY DAMAGE TO SUBSCRIBER OR
SUBSCRIBER'S PROPERTY.

* * *

11. RULES AND REGULATIONS

* * *

PrivateMoneyGoldmine.com is under no obligation to monitor the
information or content available or transmitted through the Services.

* * *

16.   WE ARE NOT A BROKER, AND HAVE DONE NO
INDEPENDENT INVESTIGATION OF THESE LENDERS.

We are not acting as a broker for any funds that you borrow from the private
lenders in this list.  We are simply providing their information.  Any
dealings that you may have with these lenders are strictly between you and
them.  We have done no independent investigation with respect to, and we
make no representation or warranty that, these lenders are honest,
trustworthy, or fair.  When they indicate an interest in lending, we simply
collect their information and add it to the list.  We cannot be held
responsible for deals that go sour.  We recommend that you do your own
due diligence on these lenders and seek the advice of qualified legal counsel
before borrowing from any of these lender[s].  Borrow at your own risk!

Exhibit 6; Exhibit 2 at ¶ 9 (emphasis in the original).

Neither REI nor any other Defendant, nor any partner of any Defendant, is a lender.

Exhibit 2 at ¶ 10.  Neither REI nor any other Defendant participates or has participated in any

business transactions that occur between the subscribers and lenders who use the website,

including any transactions involving Plaintiff.  *Id.*  Neither REI nor any other Defendant is a

partner of anyone who uses the website to post content concerning the availability of money to

lend.  *Id.*  Defendants do not receive any portion of the money that is borrowed or loaned in any transaction that may occur after subscribers contact the lenders listed on the website.  *Id.*  There never has been any mechanism on the website to transfer any money to or through REI, other than the initial fee of $97 and the monthly subscription fees of $29 to use the website services, which are paid by credit card.  *Id.*  There never has been any mechanism for REI to track whether any lenders or borrowers who use the website actually enter into any loan transactions with each other.  There also never has been any mechanism for REI to measure whether or to what extent any such loan transactions are successful.  *Id.*

Neither REI nor any other Defendant, nor any partner of any Defendant, was ever involved in any loan or other business transaction between Plaintiff and anyone else with whom Plaintiff connected by using the website.  Exhibit 2 at ¶ 11.  Neither REI nor any other Defendant, nor any partner of any Defendant, ever obtained any money paid in connection with any such loan or other business transaction.  *Id.*  Neither REI nor any other Defendant has any information at all about any loan or other business transaction that was entered into between Plaintiff and any third party with whom Plaintiff connected by using the website.  *Id.*

## IV.    Argument

### A.    Defendants, as Providers of Interactive Computer Services, are Immune from Liability Under Federal Law.

The Communications Decency Act, 47 U.S.C § 230 ("CDA") bars "state-law Plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009).  *See Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481, 485 (4th Cir. 2015) (dismissing tort claim against Yelp, based on malicious third-party reviews posted on Yelp site).  "In other words, an interactive computer service may not be liable for certain content it

'passively displays . . . .'" *Giveforward, Inc. v. Hodges*, No. JFM-13-1891, 2015 U.S. Dist.

LEXIS 102961, at *7 (D. Md. Aug. 6, 2015) (contrasting an information content provider from

an interactive computer service that merely publishes information responsible for and provided

by a content provider). The term "interactive computer service" means, in relevant part, "any

information service, system, or access software provider that provides or enables computer

access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). This definition includes

website operators such as Defendants, that bring third-party users together through the Internet.

Most federal circuits, including the Fourth Circuit, have concluded that the CDA offers

interactive computer service providers such as Defendants extremely robust federal immunity

against any cause of action seeking to hold such providers liable for information originating with

a third-party user of the service. *Zeran v. AOL*, 129 F.3d 327, 328-330 (4th Cir. 1997); *Westlake*,

599 F. App'x at 485 ("To further the policies underlying the CDA, courts have generally

accorded § 230 immunity a broad scope."). *See, e.g., Almeida v. Amazon.com, Inc.*, 456 F.3d

1316, 1321 (11th Cir. 2006) (the "majority of federal circuits have interpreted the CDA to

establish broad federal immunity" for claims against service, rather than content, providers);

*Jones v. Dirty World Entm't Recordings*, 755 F.3d 398, 406-07 (6th Cir. 2014) (collecting the

cases).

Here, there is no allegation—nor can there be any—that Defendants were anything other

than interactive computer service providers entitled to the immunity set forth in the CDA. The

facts alleged in the Complaint are obtuse, but they suggest that Plaintiff, a user of Defendants'

website, was harmed by unprofitable business transactions he undertook with other users, who

utilized Defendants' website to communicate information to Plaintiff. The Complaint itself

plainly characterizes privatemoneygoldmine.com as a website that publishes or provides

proprietary listings of private money lenders, so there is no dispute about that fact. *See* Exhibit 1 at ¶¶ 2, 3 8. See also Exhibit 2 at ¶ 2. There also is no dispute that Defendants do not create or develop the content posted on their website by the prospective lenders who use list the terms of any proposed loan transactions. Exhibit 2 at ¶ 3. All such lender information that is posted on the website is provided by the prospective lenders themselves. *Id.*

Defendants also never were involved in any way in the business transactions that Plaintiff alleges resulted in harm to him. Exhibit 2 at ¶¶ 10-11. Instead, the harm that Plaintiff alleges emanated entirely from the communications and information created by third-parties who used Defendants' website to list their prospective loan information and to network with Plaintiff through the website, and who then entered into the business transactions that Plaintiff alleges were injurious to him. Such a claim falls squarely within the CDA immunity provision. *See Nemet Chevrolet, Ltd.*, 591 F.3d at 258 (upholding CDA immunity against tort claim against computer service provider on whose website allegedly tortious consumer reviews about the plaintiff were posted); *Jefferson v. Zuckerberg*, Civil Action No. RDB-17-3299, 2018 U.S. Dist. LEXIS 111367, at *11-12 (D. Md. July 2, 2018) (upholding CDA immunity in action brought against Facebook regarding tortious content posted by a user); *Russell v. Implode-Explode Heavy Indus. Inc.*, No. CIV.A. DKC 08-2468, 2013 U.S. Dist. LEXIS 133358, 2013 WL 5276557, at *26 (D. Md. Sept. 18, 2013) (website immune from defamation claim because the plaintiff could not establish that the interactive computer service provider created the information at issue). *See also Herrick v. Grindr LLC*, No. 18-396, 2019 U.S. App. LEXIS 9318, at *9 (2d Cir. Mar. 27, 2019) (CDA bars claims for negligence and infliction of emotional distress against website that provides subscribers with access to a common server for purposes of social networking based on content provided by other site users); *Bennett v. Google, LLC*, 882 F.3d 1163, 1164 (D.C. Cir.

2018) (affirming dismissal of claims of defamation, tortious interference, and infliction of emotional distress against web site provider hosting problematic blog); *Doe v. Backpage.com, LLC*, 817 F.3d 12, 16 (1st Cir. 2016) (relying on the CDA, and affirming dismissal of claims of sex trafficking and unfair business practices against site hosting online classified ads posted and created by others); *Gibson v. Craigslist, Inc.*, 2009 U.S. Dist. LEXIS 53246, at *1 (S.D.N.Y. June 15, 2009) (relying on CDA to dismiss negligence case against Craigslist based upon handgun advertisement on the website provided by a user of the site); *Doe v. Mark Bates & Yahoo!, Inc.*, No. 5:05-CV-91-DF-CMC, 2006 U.S. Dist. LEXIS 93348, at *2 (E.D. Tex. Dec. 27, 2006) (holding that CDA immunizes defendant website host of third party communications against claims of negligence, infliction of emotional distress, and invasion of privacy).

The need to resolve the question of CDA immunity as an initial threshold matter is mandated by the Fourth Circuit cases. "[T]he CDA immunity is broad and must be determined at "the earliest possible stage of the case." *Jefferson*, 2018 U.S. Dist. LEXIS at *11 (citing *Nemet*). *See also Brown v. Gilmore*, 278 F.3d 362, 366 n.2 (4th Cir. 2002) ("Section 230 immunity, like other forms of immunity, is generally accorded effect at the earliest point in the litigation because it is otherwise 'effectively lost if a case is erroneously permitted to go to trial.'") (cited in *Russell*, 2013 U.S. Dist. LEXIS 133358, at *14-15). "Dismissal of a case on this basis is appropriate unless the complaint pleads nonconclusory facts that plausibly indicate that 'any alleged drafting or revision by the defendant was something more than a website operator performs as part of its traditional editorial function,' thereby rendering it an information content provider." *Westlake v. Yelp*, 599 F. App'x at 485.

9

Plaintiff has failed to allege the requisite facts—nor is there any possible set of facts that Plaintiff could allege—to establish that Defendants are not entitled to the CDA's immunity. With respect to any information about any possible loan transaction that was communicated to Plaintiff by other users of Defendants' website, the undisputed facts indicate that Defendants were not the *content providers*, but instead, they were merely *publishers* of content provided by others, and they therefore are entitled to the CDA's immunity. The Defendants' website confirms this, stating plainly in its Terms of Service that it "has no control over the content of any transmission nor will it be liable for such content" and that the site "is under no obligation to monitor the information or content available or transmitted through the Services." Exhibit 6 at § 11. By providing subscribers with their listing of private money lenders, Defendants simply connect prospective borrowers to the listed lenders, much the same way that Craig's List, Facebook and numerous other websites also connect buyers and sellers who list goods and services. Plaintiff was expressly warned to protect himself in any business dealings with others with whom he connected through the website, and Defendants expressly disclaimed any liability for the losses that Plaintiff claims in this case. *See* Exhibits 3, 4, 5 and 6. The CDA thus bars Plaintiff's claims, and his Complaint and all its counts should be dismissed.

**B.    Count 1 of the Complaint, Alleging Breach of Contract, Fails to State a Claim Upon Which Relief Can be Granted.**

Even if it were not barred by the CDA, Count 1 fails to state a breach of contract claim upon which relief can be granted. To maintain an action for breach of contract, the Plaintiff must allege: (1) the existence of a contractual obligation owed by the Defendants to the Plaintiff; and (2) a material breach of that obligation by the Defendants. *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 655 (2010) ("It is well-established in Maryland that a complaint alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts*

10

showing a contractual obligation owed by the defendant to the plaintiff and a breach of that

obligation by defendant.'").

Contrary to these requirements, Plaintiff's Complaint does not specify any precise

contract Defendants allegedly breached.  Plaintiff did not attach the contract on which he bases

his claim, nor does he quote directly from the terms of any contract.  The only conceivable

contract between the parties is that found in the Terms of Service governing the use of

Defendants' website (Exhibit 6).  Those terms permitted Plaintiff to use the website only after

accepting and agreeing to be bound by extensive warnings and disclaimers.  The Terms of

Service agreement informed Plaintiff, in capital letters, that if he was unwilling to be bound by

the listed terms, he should "PROMPTLY EXIT FROM THIS WEBSITE AND REFRAIN

FROM USING ITS SERVICES.  BY USING OR ACCESSING THE SERVICES,

SUBSCRIBER AGREES TO BE BOUND BY THE FOLLOWING TERMS AND

CONDITIONS."  Exhibit 6 at introductory heading; Exhibit 2 at ¶ 9.[1]

In his claim for breach of contract, Plaintiff appears to allege that he paid Defendants

money in order to receive their listings of private money lenders, brokers and investors with

whom Plaintiff then entered into business agreements.  Exhibit 1 at ¶¶ 2, 7.  He then alleges that

Defendants breached their obligation to sell Plaintiff such a proprietary list.  *Id.* at ¶ 10.  Yet

Plaintiff concedes throughout the Complaint that Defendants in fact provided Plaintiff with

exactly such a listing, which is plainly what the website does.  *Id.* at ¶¶ 8, 11, 15, 18, 19, 21, 35.

---

[1] The Terms of Service also say that the agreement will be construed in accordance with the laws of Texas.  *Id.* at § 18.  The elements of a breach of contract in Texas are similar in all pertinent respects to such a claim brought under Maryland law, so that the same result should apply regardless of which state's law is used.  *See, e.g., Beauty Mfg. Sols. Corp. v. Ashland, Inc.*, 848 F. Supp. 2d 663, 667 (N.D. Tex. 2012).

Defendants are not themselves lenders, nor are any partners of Defendants lenders. *See* Exhibit 2 at ¶ 2, 10. Neither Defendants, nor any partner of any Defendant, was ever involved in or participated in any way in any loan or other business transaction between Plaintiff and anyone else with whom Plaintiff connected by using the website. Neither Defendants, nor any partner of any Defendant, ever obtained any money paid in connection with any such loan or other business transaction. *Id.* at ¶ 11. To the extent that Plaintiff's real grievance is that the third-parties that he found through the website allegedly did not live up to their obligations in the subsequent loan or real estate transactions entered into after Plaintiff connected with them by using the website, that does not constitute a breach of any contract between Plaintiff and Defendants. In fact, any such liability was expressly disclaimed by Defendants. The website's Terms of Service say that the website "does not make any warranty pertaining to any goods or services purchased, obtained, secured or acquired through the services or any transaction entered into through the services." Exhibit 6 at § 5; Exhibit 2 at ¶ 9. The Terms of Service further say that the website operator does not warrant the accuracy or reliability of information obtained through use of the services; that any information obtained through use of the services is at subscriber's sole risk and discretion; and that the website "will not be liable or responsible for any damage" to subscriber or his property arising from use of the services. Exhibit 6 at § 5; Exhibit 2 at ¶ 9. The Terms of Service page further disclaims liability for damages arising under contract or tort for any loan transactions. Exhibit 6 at § 6. The Terms of Service and other pages that Plaintiff either clicked through or received separately notified him that the website has done no independent investigation of the listed lenders. *Id.* at § 16. If that were not clear enough, Plaintiff received repeated communications, warning him:

> WE ARE NOT A BROKER, AND HAVE DONE NO INDEPENDENT INVESTIGATION OF THESE LENDERS.

> We are not acting as a broker for any funds that you borrow from the private lenders in this list.  We are simply providing their information.  Any dealings that you may have with these lenders are strictly between you and them.  We have done no independent investigation with respect to, and we make no representation or warranty that, these lenders are honest, trustworthy, or fair.  When they indicate an interest in lending, we simply collect their information and add it to the list.  We cannot be held responsible for deals that go sour.  We recommend that you do your own due diligence on these lenders and seek the advice of qualified legal counsel before borrowing from any of these lender[s]. Borrow at your own risk!

Exhibit 6 at § 16 (emphasis in the original); Exhibit 5; Exhibit 3; Exhibit 2 at ¶¶ 6, 9.

As the above disclaimer makes plain, to the extent that Plaintiff encountered problems in connection with any loan transactions that went sour, that is a matter entirely between Plaintiff and the other parties to those transactions.  Plaintiff was plainly and repeatedly warned that Defendants would have no liability for that, and that Plaintiff himself was obligated to do his own due diligence regarding any business transactions that he undertook with other website users.  Therefore, there are no possible facts that could support a claim against Defendants for breach of contract.

C.   **Count 2 of the Complaint, Alleging Money Had and Received, Fails to State a Claim Upon Which Relief Can be Granted.**

Even if it were not barred by the CDA, Count 2 also fails to state a claim upon which relief can be granted.  The action for money had and received is an old common law claim for restitution. *Ver Brycke v. Ver Brycke*, 379 Md. 669, 698 n.13 (2004).  The claim "lies whenever the defendant has obtained possession of money which, in equity and good conscience, he ought not to be allowed to retain." *State, Use of Employment Sec. Bd. v. Rucker*, 211 Md. 153

(1956) (citations omitted).[2]  A money had and received claim is only viable where a defendant receives the money as a result of a mistake of law or fact, and did not have a right to it.  *Benson v. State*, 389 Md. 615, 652-53 (2005).  *See Smith v. Alacrity Servs., LLC*, 778 F. Supp. 2d 606, 610 (D. Md. 2011) (dismissing an action for money had and received, brought by an insured homeowner against a contractor hired and paid by the insurance carrier, who performed shoddy work, because the insured could not established that the payment by the insurance carrier to the contractor "infringed any interest of hers").

In this case, Plaintiff alleges obtusely that "Defendants, and each of them, became indebted to Plaintiff in the sum of $900,000 for monies provided by Plaintiff to Defendants and its [*sic*] partners, and each of them, at their request for the purpose of investing through the acquisition of proprietary listing [*sic*] sold by Defendants to Plaintiff."  Exhibit 1 at ¶ 15. Plaintiff fails to allege exactly what happened—what exact payments were transmitted by whom and to whom, for what purpose, and on what dates.  What is clear is that the money in dispute never passed to any Defendant, an essential element of the claim.  As the Affidavit of REI's President Alex Soares states, Defendants themselves were never parties to any of the business transactions between Plaintiff and others with whom he connected by using the website.  The lenders and borrowers using the website dealt with each other independently and "[n]either REI

---

[2] In Texas, a claim for money had and received similarly "arises when the defendant obtains money which in equity and good conscience belongs to the plaintiff." *Amoco Prod. Co. v. Smith*, 1997 Tex. App. LEXIS 2624 at *3, 946 S.W.2d 162, 164 (Tex. App. 1997).  Therefore, the result is the same regardless of which state's law applies.

nor any other Defendant, nor any partner of any Defendant, ever obtained any money paid in connection with any such loan or transaction." Exhibit 2 at ¶¶ 10-11.[3]

Plaintiff's only conceivable complaint, therefore, is that he allegedly lost $900,000 in real estate transactions with third-parties that he found by using Defendants' website. But because it is indisputable that the money in those alleged transactions was not had or received by *Defendants*, no action for "money had and received" can be brought against Defendants. *Smith, supra*. To the extent that Plaintiff paid fees to Defendants for the use of their website to connect with other potential parties with whom he transacted business, Defendant provided that service to Plaintiff—indeed, Plaintiff admits as much repeatedly throughout his Complaint. Exhibit 1 at ¶¶ 8, 11, 15, 18, 19, 21, 35.

In sum, even if this claim were not barred by the CDA, Plaintiff fails to allege sufficient facts to establish how any money was received by Defendants or any of them as a result of a mistake of law or fact. Because there are no possible facts that could be alleged to support this claim, this count must be dismissed.

**D.**     **Count 3 of the Complaint, Alleging Breach of Fiduciary Duty, Fails to State a Claim Upon Which Relief Can be Granted.**

Even if it were not barred by the CDA, Plaintiff's breach of fiduciary duty claim also must be dismissed. First, "Maryland does not recognize a separate tort action for breach of fiduciary duty." *Sharma v. Onewest Bank, FSB*, Civil Action No. DKC 11-0834, 2011 U.S. Dist. LEXIS 124978, at *16 (D. Md. Oct. 28, 2011) (dismissing count for breach of fiduciary duty). Breach of fiduciary duty "cannot be a cause of action standing alone." *See Schlossberg v. Nadel*,

---

[3] There was not even any mechanism on Defendants' website for transmitting any money either to or through Defendants, other than the initial fee of $95 and the monthly fee of $29 for accessing the service. Exhibit 2 at ¶ 10.

*Civil Action No. PX 16-100, 2016 U.S. Dist. LEXIS 105803, at \*14 (D. Md. Aug. 10, 2016)* (dismissing claim based on breach of fiduciary duty); *Bird Realty v. Jiffy Lube Int'l, Civil Action No. ELH-12-1104, 2012 U.S. Dist. LEXIS 177207, at \*26 (D. Md. Dec. 14, 2012) (citations omitted) (dismissing claim for breach of fiduciary duty); Int'l Brotherhood of Teamsters v. Willis Corroon Corp. of Maryland*, 369 Md. 724, 727 n.1 (2002) (although the breach of fiduciary duty "may give rise to one or more causes of action, in tort or contract, Maryland does not recognize a separate tort action for breach of fiduciary duty").

Second, even if such a claim existed, no fiduciary duty could ever have existed between Plaintiff and Defendants under the facts alleged in the Complaint.  Arms-length business relationships do not typically give rise to fiduciary duties.  *Am. Model Home Corp. v. Res. Mortg. Capital, Inc.*, No. 98-1396, No. 98-1691, 1999 U.S. App. LEXIS 2849, at \*12 (4th Cir. Feb. 24, 1999); *Felichko v. Schechter*, Civil Action No. RDB-18-1392, 2019 U.S. Dist. LEXIS 49869, at \*43 (D. Md. Mar. 22, 2019) (confidential relationship may exist independent of the business relationship, but not in a business transaction where the parties further their own business objectives).  *See also Auto USA, Inc. v. DHL Express (USA), Inc.*, Civil Action No. CCB-17-1312, 2018 U.S. Dist. LEXIS 30084, at \*11-12 (D. Md. Feb. 26, 2018) (a defendant only owes an equitable duty where a confidential relationship exists between the parties such that the defendant "purports to act or advise with the [plaintiff]'s interest in mind.").

A fiduciary duty has only been recognized in very specific relationships that involve a high degree of trust and confidence, such that one party owes a duty to advance the interests of the other party over self-interest.  For example, the courts in Maryland have recognized fiduciary duties owed to business partners, *Della Ratta v. Larkin*, 382 Md. 553, 577 (2004); to shareholders by their corporate directors, *Shenker v. Laureate Educ. Inc.*, 411 Md. 317, 351

(2009); and to principals by insurance agents, *Insurance Co. of North America v. Miller*, 362 Md. 361, 379 (2002). In contrast, there is no fiduciary duty arising in the relationship between a bank and its customers, *Sharma*, 2011 U.S. Dist. LEXIS 124978 at *17; between an escrow agent and a fund recipient not in contractual privity with the agent, *Lathan v. Sternberg*, 2015 Md. App. LEXIS 276, at *13-17 (Md. Ct. Spec. App. Sep. 30, 2015); or between corporate directors and employees, *Byington v. Vega Biotechnologies*, 869 F. Supp. 338, 345 (D. Md. 1994).[4]

Defendants are aware of no case in any jurisdiction holding the operators of a website liable as fiduciaries to users of the website, and Plaintiff has failed utterly to allege any facts in the Complaint that would establish the basis for any such fiduciary relationship between Plaintiff and any of the Defendants. There was no confidential relationship, and Defendants never purported to act on Plaintiff's behalf as to any business transaction undertaken with other website users. To the contrary, the website clearly stated the exact opposite, informing users to do their own due diligence and to seek advice from qualified legal counsel. *See* Exhibits 3, 4, 5 and 6. In *Manchanda v. Google*, No. 16-CV-3350 (JPO), 2016 U.S. Dist. LEXIS 158458, at *14 (S.D.N.Y. Nov. 16, 2016), the court dismissed a similar claim against Google because the website was under no duty to act for or give advice to the plaintiff.

---

[4] If Texas law applies, the result would be the same because courts in Texas will not impose a fiduciary duty in a business relationship, absent a prior and separate special relationship of trust and confidence between the parties. *Associated Indem. Corp. v. CAT Contracting,* 964 S.W.2d 276, 288 (Tex. 1998) (no fiduciary duty between bond surety and principal). "A fiduciary relationship is an extraordinary one and will not be lightly created; the mere fact that one subjectively trusts another does not, alone, indicate that he placed confidence in another in the sense demanded by a fiduciary relationship, because something apart from the transaction between the parties is required." *Stephanz v. Laird*, 846 S.W.2d 895, 901-02 (Tex. App. 1993). The Complaint does not contain the requisite allegations regarding a prior, special relationship of trust and confidence as would be required under Texas law.

Here, Plaintiff simply asserts his conclusion that "Defendants had a fiduciary duty and obligation to safeguard and protect the Plaintiff's funds which they induced him to invest with Defendants [*sic*] partners who are private money lenders, real estate loan brokers, and real estate loan investors listed on Defendants [*sic*] proprietary listing." Exhibit 1 at ¶ 22. Plaintiff does not identify the particular fiduciary relationship that existed between Plaintiff and Defendants or the source of that relationship. *See Latty v. St. Joseph's Soc'y of the Sacred Heart*, 198 Md. App. 254, 264, 17 A.3d 155, 160 (2011) (claim for breach of fiduciary duty requires that the plaintiff identify the particular fiduciary relationship involved). Plaintiff also does not explain in his Complaint how third-party "money lenders, real estate loan brokers, and real estate loan investors" who posted content on the Defendants' website were thereby converted into Defendants' "partners," as he alleges. *See* Exhibit 1 at ¶ 22. At bottom, Plaintiff cannot establish that by operating a website, Defendants entered into any relationship of trust or confidence with Plaintiff, such that Defendants were obligated to act in Plaintiff's best interests. Further, although Plaintiff asserts that Defendants "made promises that the funds would be well invested when Defendants sold the proprietary list of private money lenders, real estate loan brokers, and real estate loan investors to the Plaintiff," Exhibit 1 at ¶ 18, the website's multiple disclaimers said exactly the opposite. *See* Exhibits 2, 3, 4, 5 and 6.

Finally, Plaintiff's claim for breach of fiduciary duty is based on his allegation that he lost money in connection with real estate transactions with third-parties that he found using Defendants' website. Assuming that such a claim is not barred by the CDA, Plaintiff already has sued for that same claim under other theories in the other counts of his Complaint. To allow Plaintiff also to assert an omnibus and independent "breach of fiduciary duty" cause of action in addition to those other claims would convert every commercial dispute into a "breach of

fiduciary duty" case. That is a slippery slope which Maryland courts have consistently avoided. *See Kann v. Kann*, 344 Md. 689, 712 (1997).

For these reasons, Plaintiff's breach of fiduciary duty claim in Count III should be dismissed.

**E.**     **Count 4 of the Complaint, Alleging Misappropriation of Funds, Fails to State a Claim Upon Which Relief Can be Granted.**

Assuming that the CDA does not also bar Plaintiff's claim for misappropriation of funds, Defendants are aware of no cases setting forth the elements of a stand-alone civil claim of misappropriation of funds, which is Count 4.[5] Therefore, Count 4 alleges essentially a claim of conversion, defined as "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 261 (2004). However, a conversion claim does not lie in the case of unsegregated funds, such as those involved here. *Betskoff v. Bank of Am. Nat'l Ass'n*, 538 F. App'x 308, 309 (4th Cir. 2013) (citations omitted) ("Maryland law established that money, as an intangible, is not subject to a claim for conversion unless 'a plaintiff can allege that the defendant converted specific segregated or identifiable funds.'"); *Lasater v. Guttmann*, 194 Md. App. 431, 447 (2010) (granting summary judgment to defendant of claim of conversion of funds, the court stated "[t]he general rule is that monies are intangible and, therefore, not subject to a claim for conversion."). Plaintiff has not alleged that Defendants misappropriated or

---

[5] The term "misappropriation of funds" is most often found in the Maryland caselaw as a basis for discipline in attorney grievance cases. *See, e.g., Atty. Griev. Comm'n v. Weiss*, 389 Md. 531 (2005).

converted specific, identifiable funds.[6]  For these reasons, this claim must fail.  *See Dickman v. Banner Life Ins. Co.*, Civil Action No. WMN-16-192, 2016 U.S. Dist. LEXIS 176364, at \*23 (D. Md. Dec. 21, 2016) (dismissing claim of conversion because allegations do not indicate the cash at issue was specific and identifiable).[7]

### F.   Count 5 of the Complaint, Alleging Fraud, Fails to State a Claim Upon Which Relief Can be Granted.

Even if it were not barred by the CDA, Plaintiff's fraud claim must also be dismissed.  To recover for fraud or intentional misrepresentation, the Plaintiff must show that the representation made was false, that its falsity was known or should have been known by the Defendants, that it was made for the purpose of defrauding Plaintiff, and that the Plaintiff not only relied upon the misrepresentation, but had the right to rely upon it.  *Martens Chevrolet v. Seney*, 292 Md. 328, 333 (1982).  "In addition, the defendant must intend to mislead the plaintiff; his misrepresentation must in fact mislead the plaintiff, and the plaintiff must suffer injury therefrom."  *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232 (1995); *see also Barrie School v. Patch*, 401 Md. 497, 517 (2007); *Maryland Environmental Trust v. Gaynor*, 370 Md. 89 (2002).[8]

---

[6] Moreover, as set forth above in the Statement of Undisputed Facts and also in Argument IV(C), Defendants never received any money allegedly invested in any loan transaction involving Plaintiff.

[7] If Texas law applies, courts in Texas similarly view conversion as "the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights."  *Pipes v. Hemingway*, 358 S.W.3d 438, 449-50 (Tex. App. 2012).  Texas courts also reject such claims unless they involve money in the form of specific chattel or when the money is segregated.  *Mitchell Energy Corp. v. Samson Res.*, 80 F.3d 976, 984 (5th Cir. 1996).

[8] To the extent the Court looks to Texas law, the elements of common law fraud are comparable to the elements of fraud under Maryland law.  *See Kaheel Props., LLC v. Azteca Entm't Enters.*, No. 11-16-00137-CV, 2018 Tex. App. LEXIS 4316, at \*6 (Tex. App. June 14, 2018)

Plaintiff alleges that "Defendants, and its [*sic*] partners each of them, represented to Plaintiff that they would use their best efforts to provide a proprietary listing of private money lenders, real estate brokers, and real estate loan investors . . . ." Exhibit 1 at ¶ 30.  But that is precisely what the Defendants' website does, and Plaintiff admits throughout his Complaint that Defendants did indeed provide their proprietary listing to him. *Id.* at ¶¶ 8, 11, 15, 18, 19, 21, 35. The disclaimers given to Plaintiff also made it quite clear that Defendants made no representations whatsoever regarding the accuracy of information posted by other users on Defendants' website.  *See* Exhibits 3, 4, 5 and 6.  Because there are no possible facts that would support a claim of fraud in this case, that claim also must be dismissed.

### G.   The Complaint Fails to State a Claim Upon Which Relief Can be Granted Against the Individual Defendant Under any Count.

Plaintiff has named John Douglas Smith as an individual Defendant.  However, the Complaint does not include a single allegation accusing Mr. Smith of personal wrongdoing of any kind.  Apart from naming him as a Defendant, the Complaint does not mention Mr. Smith at all, and it fails to provide any factual basis for his inclusion as an individual defendant.  If Plaintiff is suing him due to his status as an officer of one of the Defendants, that is not enough to impose personal liability on Mr. Smith.

Officers and owners of corporate entities generally are not liable in tort or contract based solely on their status as corporate officers or owners.  *Farm Fresh Direct By a Cut Above, LLC v. Downey*, Civil Action No. ELH-17-1760, 2017 U.S. Dist. LEXIS 178190, at *11 (D. Md. Oct. 26, 2017).  If a corporate officer takes no part in the commission of a wrongful act that the corporate entity allegedly committed, he or she generally is not personally liable.  *Allen v. Dackman*, 413 Md. 132, 152 (2010) (a member of an LLC not liable for torts committed by, or contractual obligations acquired by, the LLC unless he or she specifically directed the particular

act to be done or participated therein).  "If a director does not personally participate in the corporation's tort, general corporation law does not subject him to liability simply by virtue of his office." *Tillman v. Wheaton-Haven Recreation Ass'n*, 517 F.2d 1141, 1144 (4th Cir. 1975).[9]

The Complaint lacks any allegations tying Mr. Smith, in his individual capacity, to any alleged wrongdoing as a result of his direct participation in any acts.  The Complaint does not even allege that the Plaintiff had any contact or communications at all with Mr. Smith. Mr. Smith therefore must be dismissed as a Defendant.

**V.      Conclusion**

For the foregoing reasons, all counts of the Complaint should be dismissed with prejudice as to all Defendants, or alternatively, Defendants should be granted summary judgment.

FEDDER & JANOFSKY LLC


By:_____/s/_____
        Julie C. Janofsky
        USDC MD Bar No. 002622
        jjanofsky@mdcounsel.com
        2650 Quarry Lake Drive – Suite 100
        Baltimore, MD  21209
        (410) 415-0080

        *Attorneys for Defendants*

---

[9] If Texas law is applicable, it is similar to Maryland's.  Absent allegations that an individual shareholder used a corporate form to perpetuate a fraud for the shareholder's own benefit, an individual shareholder "may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation on the basis that the holder is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, *or other similar theory* . . . ." *Willis v. Donnelly*, 199 S.W.3d 262, 272 (Tex. 2006) (emphasis in original); *see also Shafipour v. Rischon Dev. Corp.*, No. 11-13-00212-CV, 2015 Tex. App. LEXIS 5493, at *11, 15 (Tex. App. May 29, 2015) (a corporate officer's acts on the corporation's behalf are deemed corporate act and an officer acting in good faith cannot be held liable for such).